37 So.2d 645

**TAYLOR v. TAYLOR.**

6 Div. 608.

Supreme Court of Alabama.

May 27, 1948.

Rehearing Denied Nov. 26, 1948.

See also, Ex parte Taylor, post, p. 387, 37 So.2d 656.

Gibson & Gibson, of Birmingham, for appellant.

Chas. W. Greer and Frank Bainbridge, both of Birmingham, for appellee.

378

LIVINGSTON, Justice.

The complainant in the court below, appellee here, filed her bill of complaint in the Circuit Court of Jefferson County, in Equity, against appellant, seeking a divorce from bed and board, alimony and attorneys' fees pendente lite, permanent alimony, attorneys' fees, and general relief. She alleged that the parties were lawfully married on May 30, 1942, and lived together as man and wife until October 24, 1946, at which time appellant abandoned her by forcing her to leave their home against her will. She further alleged that appellant had contributed only $200 to her support between October 21, 1946, and December 9, 1946, the time of filing suit, and which amount was inadequate and insufficient to support and maintain her according to the station in life of appellee and appellant, and that respondent had failed or refused to contribute more to her support and maintenance.

After demurrer was filed, appellee amended her bill of complaint. The charging part of the bill was not substantially changed, but the bill as amended prayed for a divorce from bed and board, or, in the alternative, a legal separation and allowance out of the income and property of respondent. Demurrer was filed to the bill as amended, and overruled.

A reference was ordered upon appellee's prayer for alimony and counsel fees pendente lite, and to test the bona fides of the bill. Upon a hearing the register determined that the bill was filed in good faith, and fixed $200 as a reasonable fee, and $125 per month as a proper sum for alimony pendente lite. No exceptions were reserved to this report, and it was duly confirmed.

Appellant answered the bill and denied that he forced appellee to leave the home. He alleged that she left voluntarily because of domestic disagreements and incompatibility of the parties, and for which appellee's conduct was partially responsible. He alleged that during the period of approximately seven weeks between the separation and the filing of her bill, he had contributed $200 in cash to her support, and had paid $125 of her personal bills. He alleged that he had a seventeen year old daughter by a former marriage, who was totally dependent upon him for support and education; that his sole source of income was $348.61, as a retired brigadier general of the United States Army; that his retirement was compulsory, and on account of his health; that he is forty-eight years of age, and in bad health; and that appellee is forty-two years of age, and in good health, and has no dependents or debts. That prior to the marriage of the parties, appellee, who had never been married, operated a dancing school in the city of Birmingham for some

seventeen to twenty years, and was capable of earning a good livelihood. That he was heavily in debt and, aside from equities in insurance policies, an automobile, and personal effects, owned no property.

Issue was joined on the amended bill and answer. At the conclusion of the testimony, taken ore tenus, the trial court rendered a decree granting appellee separate maintenance in the sum of $137.50 per month, and an additional counsel fee of $200. From that decree, this appeal is prosecuted.

The appellant's statement of the evidence is, we think, sufficient and accurate enough for a determination of the question here presented, and inasmuch as it is not seriously questioned nor contradicted, in its material aspects by appellee, we quote it here (Supreme Court Rule 10, Code 1940, Tit. 7 Appendix):

"Complainant's evidence was that the parties were married in Birmingham, Alabama, on May 30, 1942, at which time respondent was a Lieutenant Colonel of Infantry in the regular Army. The couple lived together at Fort Benning until about August 1, 1942, when respondent left for overseas. Complainant and the thirteen year old daughter of respondent by a previous marriage then removed to the former home of complainant in Birmingham, Alabama, and complainant rented an apartment. Relations between the two parties were good when respondent left, and he wrote complainant regularly and frequently after going overseas. He made an allotment of his pay in the total amount of $350.00 per month of which $50.00 went into a joint account the couple had in San Francisco, and the balance was used for the support of complainant and the young girl. The rent was $70.00 per month.

"Complainant next saw respondent on September 1, 1945, when she met him in Washington after a telephone call upon his return to this Country. They lived together until respondent' went into the hospital at Ft. McClellan, Alabama, that same month. During that period, during respondent's six weeks to two months stay in the hospital, and in the interval between his release from this hospital and his departure for another military hospital in Oklahoma in February 1946, the relations of the parties were amicable and unclouded by domestic dispute or discord. Respondent's letters throughout his three months confinement in the latter hospital were affectionate.

"When respondent returned to the home in June 1946, the parties resumed affectionate relations, went out together in the evenings and lived in harmony until around the middle of September or the first of October 1946. At this time respondent began to exhibit indifference toward complainant, depression and lack of interest in going places. He was disinclined to discuss his attitude and situation, did nothing but take solitary walks, and was 'miserable'. Complainant's efforts to arouse his interest in sports and related activities were persistent but unavailing. On October 21, 1946, during a conversation along these lines, respondent told complainant that he did not like the way things were, and that he wanted her to leave the house. He gave no specific reason. Complainant protested that she loved him and thought they could be happy together if respondent would try to straighten himself out. Later, he remarked that he wanted a divorce and that he had grounds for divorce and wanted complainant to leave. On the night of October 22, 1946, complainant summoned Mr. Bainbridge, a lawyer acquaintance, to the home, and she and Mr. Bainbridge discussed the situation. Later, at her request respondent joined the conference with some reluctance. He made no charges against complainant but said that he wanted a divorce and was going to get one. Subsequently, respondent and a Mrs. Bahrt, an old friend of complainant, discussed the situation, and on the 23d or 24th of October, with his counsel, he had another conference with Mr. Bainbridge. On the morning of October 24th, he stated that he would give her $100.00 per month for one year and he would get a divorce. Complainant stated that she would not accept this, and left the home, moving to her mother's house. She took her clothes with her, and subsequently got some furniture which belonged to her. The two discussed the matter together at respondent's in-

stance on one occasion thereafter. At this time respondent again offered her $100.00 per month, and said that if it were not accepted he could and would obtain a divorce upon grounds which he had. She denied any marital misconduct with anyone and stated that respondent had never accused her of same. During their last conference complainant told respondent she still loved him and asked why he was so conducting himself, without reply. No offer of reconciliation was made or discussed and nothing was said as to the support of complainant, by either party. The respondent while overseas was paid about $700.00 per month. His retired pay was $412.50. Respondent had made two deposits of $100.00 each in her bank account after the separation and before suit was filed. She resided with her parents, with board and room rent cost of $50.00, per month, paid $23.00 per month premium on an annuity and had three or four dollars per month expense for cleaning, and the cost of replacing her clothes. The joint bank account and certain bonds purchased from the allotment yielded complainant no money, respondent having told her that the funds were used to pay income tax. Certain insurance policies of which she was the beneficiary were sent by her to respondent's brother in California, at the written request of respondent after he got overseas.

"Complainant was forty-two years old and in good health. For approximately twenty years before her marriage she had followed the profession of dancing teacher in Birmingham, and earned about $200.00 per month. For two years after her marriage, she worked from one to two days per week at a local school, earning $50.00 to $60.00 per month. She owed nothing, had not been married before and had no children. She received approximately $1,000 from her husband while he was overseas, in addition to the regular allotment payments. The two parties actually cohabitated for about ten months during the period of their marriage. Respondent had been reluctant to take her places or to discuss their affairs with her and this led to quarrels after the middle of September or the first of October prior to the separation. Complainant realized that the depressed and miserable condition of respondent was caused by his impending retirement from the Army and his worry over his physical condition. She had said that she wished to live in Birmingham after her husband's retirement, and, in anger, that she was afraid she should not like his relatives in California.

"Respondent had given her expensive jewelry and maintained her amply within his means. He had always been courteous, and never struck her, cursed her, used profanity before her friends nor been offensive to them; and never directly accused her of infidelity, nor to her knowledge ever been unfaithful to her. He had taken her on two recreational trips since his return from overseas. She owned an annuity policy, a life insurance policy, a postal savings account of approximately $100.00 and twenty shares of Packard Motor Company stock. She had informed the respondent that political pressure might be used with certain people in Washington to prevent his retirement and he rejected the suggestion, stating that he wanted no political pressure applied.

"In the first conference held at the Taylor home, after some discussion as to whether their differences could be adjusted, Mr. Bainbridge brought up the subject of divorce, suggesting that if there was to be a divorce she should be the one to get it. Respondent did not agree to this suggestion, stating that he wished to get the divorce and that he desired legal advice of his own. On the next day complainant left the home and had never returned except to get her possessions. The upkeep of her home and the respondent's daughter consumed $300.00 per month, and complainant paid no income tax while respondent was overseas. Complainant had sold the equipment of her dancing studio after her marriage. It would take approximately $200.00 per month to support her in the style to which she had been accustomed while she and respondent were living together.

"Sheriff McDowell of Jefferson County had known complainant practically all her life and said her reputation in the community in which she lived for truth and veracity was good. He would believe her on

oath in a matter in which she was interested.

"Complainant had received $1200.00 from respondent while he was overseas, in addition to her allotment. All of this had been spent for trips, household effects and living expenses since respondent's return. Respondent had sent a letter to his daughter from overseas asking her to send his insurance policies to California. She had transmitted to the Travelers Insurance Company a letter of respondent requesting that the beneficiary be changed to her, but this change had not been accomplished. Complainant had a general power of attorney from respondent while he was overseas and his will was drawn in her favor.

"The showing for Mrs. Carl Bahrt was in substance that she had visited the Taylor home about ten days or two weeks prior to 23 October, 1946, and at that time both appeared happy and no trouble was apparent. On her next visit, 23 October, 1946, she first learned from complainant that there was trouble. Respondent stated to her in a private conversation that he wanted to get a divorce and wanted his wife out of the apartment. He made no charges or complaints against his wife.

"Mr. Bainbridge, of counsel for complainant, denied making a suggestion that complainant get a divorce, at their conference in the home on 22 October, 1946, stating that the first mention of divorce came from respondent. Mr. Bainbridge was summoned to the Taylor apartment by complainant and was there in the dual capacity of her friend and attorney. It was at his instance that respondent entered the conference.

"Evidence of the respondent was that he was forty-eight years old, an officer of the United States Army, retired for physical disability. He had followed the profession of arms since he was less than twenty years old and had no training to fit him for other occupations. The causes of his retirement were serious impairment of hearing in both ears, caused by a bomb blast in Tunis, and glaucoma, an eye disease which is accentuated by tension and in certain stages might lead to blindness. He had been receiving about $600.00 or more per month while overseas. The retired pay of his grade was $375.00 per month, plus a temporary ten percent war-time increase, and the net monthly check, after deduction of insurance premiums was $348.01. He was the sole support of a daughter, then seventeen years of age and a senior in high school, the child of a previous marriage. He owed $2,900 in debts, about half of it for back income tax for the years in which he was overseas. This tax was payable at $200.00 per quarter. He had spent three years and three months overseas, the greater part of it in combat, and had been hospitalized for an abdominal operation, on one occasion, and for a period of three months undergoing eye and ear treatment on another since his return to this Country. During the latter portion of this period, he had been placed before an army retirement board. Upon his return from this Hospital he had not completely recovered from the effects of the abdominal operation and was worried, depressed and in an unhappy frame of mind because of his impending retirement, which he did not want, and was reluctant to go about socially. In discussions of the retirement, complainant's attitude had been that the retirement was respondent's fault, and she objected to moving to California and being near his relatives. These subjects and respondent's reluctance to go out socially or to go on expensive trips were frequently discussed and led to bickering and marital dissension. He had saved and sent to complainant $1500.00 in addition to the $350.00 monthly allotment while he was overseas. He did not order complainant from the house on 21 October, 1946, nor at any other time. On the evening of 22 October, Mr. Bainbridge came to the home at complainant's instance, and after the two had conferred, he was invited to join the consultation. Mr. Bainbridge and complainant initiated discussion of divorce and Mr. Bainbridge proposed that Mrs. Taylor be allowed to obtain a divorce upon the ground of cruelty, to which respondent replied that he wished legal advice of his own to learn whether or not he should be the one to apply for a divorce. Complainant then stated that she and respondent had decided to separate and that she had reluctantly agreed to a divorce. He was in love with

his wife at the time of his departure overseas and after his return and during that time she was an affectionate and loving wife. Before going overseas he changed the beneficiary upon certain life insurance policies, totaling $14,000.00, to his wife, but did not change a $10,000.00 Travelers policy, payable to his daughter. In Scotland in October, 1942, he added to this policy as alternate beneficiary his niece, Patricia Ann Taylor, and changed his other policies back to be payable to his daughter. His wife, if he had been killed, would have received about $3,000.00 in cash and a pension of $50.00 per month. He did not recall whether he had advised his wife, when he wrote her to send his policies to his brother in California, that he intended to make beneficiary changes. Respondent would have been willing for complainant to remain as his wife on 21, 22, 23 and 24 October, under circumstances different from those created by her calling an attorney and making application for a divorce in his presence. He decided that he did not want to live with her because of these events and because of her departure on 24 October. He did not respond to a suggestion by Mr. Bainbridge on 22 October, that he and his wife become reconciled, with a refusal. He did not state in a subsequent conference between himself, his counsel and Mr. Bainbridge in substance that there was no chance of a reconciliation. He had declined to discuss his and complainant's domestic situation with the parents of his wife, and with her friend, Mrs. Carl Bahrt. He had not been willing to resume the marriage relation with complainant since the filing of the suit against him, but might have been prior to that event. He had seen her only once since the separation and had not asked her to return to him as his wife. He had withdrawn his funds totalling something over $600.00 from banks in Colorado Springs and San Francisco in 1945, and had cashed some $700.00 worth of War Bonds about ten months or a year before the separation. Respondent's daughter was living temporarily with his relatives in California and he was responsible for her expenses.

"Respondent was unable to do any work. His retirement from the Army was for physical reasons. He had not made a claim against any insurance company under clauses in his policies covering disability payments. He had made inquiry concerning them of the Veterans Bureau and a Prudential representative and been told by the latter that his disability did not come within the provisions of the policy. He had applied for waiver of premium in the United States Government policy and his claim was rejected. He had made no further effort to collect benefits under these policies. There had been no definite agreement between the parties as to a separation, but there was an understanding that one or the other would apply for a divorce at the time the complainant left the home. Respondent did not want her to remain under the conditions that existed at that time, nor if she wanted to leave. Respondent and her daughter had been living on about $250.00 per month since the separation, his gross income being $412.50, and deductions for insurance premiums on policies payable to his daughter reducing this to $348.01. The $250.00 per month was the cost of food, shelter and incidentals for respondent and his daughter and did not include any reduction of tax indebtedness, clothing, repairs or other capital outlay.

"Existence of the marriage, the fact and date of the separation, the amount of retired pay of respondent, the fact that complainant had no present income, were undisputed. It was also undisputed that there had been no misconduct of any sort and no discord during the marriage until from three to five weeks before the separation. Further, that no serious breach occurred until three days before the separation, which involved complainant's departure from the home. Under the undisputed evidence the appellant had been in poor physical health and in a depressed and worried state of mind due to his retirement with curtailment of income, and his physical condition, throughout the period prior to the separation. The evidence agrees that he had never been guilty of cruelty, profanity, rudeness or accusations of unchastity at any time, and that the conduct complained of as justifying complainant's leaving him was of only three days' duration. It was undisputed that respondent

had a minor child by a previous marriage, for whose support and education he was liable. There was sharp conflict in the testimony concerning what occurred during the three days just prior to the separation."

Before responding to the question of appellee's right to separate maintenance and the amount thereof, we will proceed to dispose of other assignments of error.

Appellant insists that the bill, as originally filed, was insufficient to invoke equity jurisdiction, in that, it showed on its face that appellee was not entitled to a divorce from bed and board because abandonment for one year, the statutory period, was not alleged, and as a consequence the entire proceeding before the register in regard to alimony and attorneys' fees pendente lite, and the confirmation of the register's report, were coram non judice, and wholly void.

■ While the bill was insufficient to support a decree for a divorce from bed and board on the statutory ground of abandonment, it did contain a prayer for general relief. Regardless of statute, or the right to a divorce, the court may under its general equity power, decree separate maintenance, upon sufficient allegation and proof; and we have held that a general prayer is sufficient for that purpose. In other words, the right to separate maintenance is not dependent upon the existence of some statutory ground for divorce. Wohlert v. Wohlert, 217 Ala. 96, 114 So. 906; Spafford v. Spafford, 199 Ala. 300, 74 So. 354, L.R.A.1917D, 773; Cross v. Cross, 200 Ala. 21, 75 So. 333.

■ The bill as originally filed, and as amended, was sufficient as against demurrer to support a decree for separate maintenance, and, therefore, the register's findings and report, together with the confirmation of same, were not without authority of law. Authorities, supra.

The trial court, over the objection of appellant, admitted in evidence two policies insuring the life of appellant. Each policy provides for payments to be made appellant in the event he becomes permanently totally disabled.

Assignments of error 13 to 63, both inclusive, are grouped and argued together in brief.

■ Assignments numbered 17 and 18 are based on the court's action in overruling appellant's objection to the introduction of the two insurance policies. The other assignments deal with questions and answers concerning the policies. The rule is that if one assignment thus grouped and argued is without merit, the others will not be considered. Moseley v. Alabama Power Co., 246 Ala. 416, 21 So.2d 305; Sovereign Camp, W. O. W. v. Davis, 242 Ala. 235, 5 So.2d 480; Morgan-Hill Paving Co. v. Thomas, 223 Ala. 88, 134 So. 480.

The policies were properly admitted. The argument is made that because in suits for separate maintenance, only the income of the husband shall be considered in fixing the amount to be paid the wife, that the extent of his assets or property is not a proper subject of inquiry.

■■ In separate maintenance suits the allowance to the wife is based upon the earning or income and earning capacity of the husband, and not on the corpus of his estate. Wallis v. Wallis, 240 Ala. 439, 199 So. 844, and cases there cited. Ordinarily, assets or property, including policies of insurance of the kind here involved, are acquired and held for the purpose of producing income. So far as we are able to find, none of our cases hold that the extent of a husband's assets or property, whether income producing or not, cannot be shown in a suit for separate maintenance. In fact, they clearly indicate the contrary. All facts, proving or tending to prove, the amount of the husband's income are admissible. The insurance policies being admissible, other assignments of error grouped and argued together with those based on the admission of the policies will not be considered. Authorities, supra. The insurance policies being admissible, appellant can take nothing by assignments 70 to 77, both inclusive, and assignment 79.

■ Over appellant's objection, appellee was permitted to testify that she had no dates with other men while appellant was overseas or while he was in the hospital after his return to this Country, but had stayed at home and looked after appellant's daughter. Although no accusation was made reflecting on appellee's character in this regard, her conduct was a material in-

quiry, and while the evidence has little real value it was not reversible error to admit it.

█ No error intervened in permitting appellee to testify that on the hearing before the register she offered to return to appellant's home and resume the marital relationship.

█ As we have above indicated, in separate maintenance suits the extent of the husband's estate may be shown. It was therefore no error to ask the wife if she knew of any assets of appellant aside from his retirement (assignment No. 9).

██ In arguing assignments of error 10 and 11 appellant complains that the trial court erred to reverse in sustaining objections to the question made the basis of assignment 10, as follows: "What is the state of her health?" referring to appellant's mother. Standing alone, the state of appellant's mother's health is not material. No effort was made to show that she lived or had ever resided in this State, and no effort was made to show that appellant was responsible for her support, whether under the laws of this State or any other state where she may reside. Following the foregoing ruling appellant's counsel asked him, "Are you responsible in part or wholly for the support of anyone else besides your daughter?" Appellant argues that this question referred to appellant's mother, but the question put is far more general. The question involves a mixed question of law and fact. We are unwilling to reverse this case on assignments 10 and 11. Supreme Court Rule 45.

█ The trial court sustained objection to the following question propounded to appellant on direct examination, "What campaign did you participate in?" (Assignment No. 12.) Clearly, appellant's war record, his length of service overseas, and his disabilities resulting therefrom were well developed in the evidence. Admitting, without deciding, that his answer should have been admitted, under Rule 45, supra, we cannot say that the court's ruling was prejudicial to the extent of working a reversal.

█ Assignment of error 65 is based on the overruling of appellant's objection to the following question propounded to appellant on cross examination: "General, is it a fact that prior to October 21, 1946, you had been to see a lawyer with reference to getting a divorce or separation from your wife?" The answer was, "that is not correct, I had not." Error, if any, in overruling the objection, was rendered harmless by the answer to the question. Assignments of error 65 and 66 are grouped and argued together. We have disposed of assignment 65, and under the rule above stated, we will not consider assignment 66. Assignment of error 67 is entirely too general for a consideration by this Court. Hall v. Pearce, 209 Ala. 397, 96 So. 608; Jackson Lumber Co. v. Butler, 244 Ala. 348, 13 So.2d 294; Supreme Court Rule 1.

█ Assignments of error 68 and 69 are predicated upon the testimony of Mr. Holt McDowell, sheriff of Jefferson County. Over objection, he was permitted to testify that he had known Mrs. Taylor, the appellee, nearly all of her life; knew her reputation for truth and veracity, and would believe her under oath. Mrs. Taylor's reputation for truth and veracity had not been attacked. Under the circumstances, bolstering testimony was not admissible. 19 Alabama Digest, Witnesses, ☜318.

█ After a careful examination of the entire record in this case, we are of the opinion that the admission of this evidence did not injuriously affect the substantial rights of appellant, and for that reason we will not reverse the cause. Supreme Court Rule 45.

█ Questions made the bases of assignments 64 and 78 were not improper under our liberal rule governing cross examination.

Appellant most earnestly insists that appellee failed to prove her right to withdraw from the home and thereafter to maintain the position that her abandonment was justified, and her own hands clean before a court of equity.

Here, as is frequently the case in suits of this kind, the application of the law to the facts presents a most difficult problem. As early as Bryan v. Bryan, reported in 34 Ala. 516, 519, 520, it was said by Chief Justice Walker: "There is no correct view

of the married relation, which will authorize a wife to leave her husband, and place both him and herself in the 'undefined and dangerous situations of a husband without a wife, and a wife without a husband,' merely an account of such rudeness of language, indelicacy of expression, grossness of manners, and disrespectful bearing, as may appear from the evidence in this case to have characterized the conduct of the defendant. People v. Mercein, 8 Paige, N.Y., 47; Evans v. Evans, 2 Haggard 35. However, hard it may be to endure such conduct, and however we may sympathize with and desire to relieve one subjected to it, the hardships of individual cases must be borne, and sympathy for them must bend in deference to the great social interests, and wise public policy, and biblical precepts, in which are founded general rules consulting for the permanency and stability of the marriage institution. One who enters into this relation must, by a uniform exhibition of affection, by mild remonstrance, by gentle and moderate resistance, by judicious reasoning and soft persuasion, by a forebearance of resentment, by an accommodation to peculiarities, and, above all, by a constant display of an example of conjugal propriety, strive to cure such faults as the evidence imputes to the defendant. If such causes were recognized as a sufficient justification for a separation, the first unguarded sally of passion on the part of one of the married pair would often be met by unyielding harshness, and attended by an unforgiving temper, and thus become the ultimate cause of estrangement and abandonment."

And in Anonymous, 206 Ala. 295, 89 So. 462, 463, Justice Somerville wrote: "Courts will not justify such withdrawals except for the gravest and most compelling reasons—reasons which involve the fundamental happiness and self-respect of the withdrawing spouse, and the vicious and unjustifiable conduct of the other. And the provoking misconduct should not be occasional or transient only, but continuous or persistent, and apparently irremediable."

The following cases fully support the foregoing statements of the rule. Perry v. Perry, 230 Ala. 502, 162 So. 101; Campbell v. Campbell, 246 Ala. 107, 19 So.2d 354, 155 A.L.R. 130; Stephenson v. Stephenson, 213 Ala. 382, 105 So. 183; Miller v. Miller, 234 Ala. 453, 175 So. 284; 17 Am.Jur. 306; 27 Corpus Juris Secundum, Divorce, § 108, page 700; sections 20(3) and 36, Title 34, Code.

And we have said in cases of this kind that "it has often been held to be the duty of the husband to visit his absent wife, and to endeavor by all proper means to effect a reconciliation," see, Campbell v. Campbell, supra [246 Ala. 107, 19 So. 2d 355].

Without further detailed discussion of the evidence, we are persuaded thereby of the wife's willingness to resume the conjugal relationship, and of the husband's evasion of that issue: if not his absolute refusal of a reconciliation. The trial court heard and saw the witnesses, and we are not willing to disturb his finding of the wife's right to live separate and apart from the husband.

On the other hand, after a careful consideration of the entire record, we are fully persuaded that the award to the wife is excessive. See, Garlington v. Garlington, 246 Ala. 665, 22 So.2d 89; Sills v. Sills, 246 Ala. 165, 19 So.2d 521; Puckett v. Puckett, 240 Ala. 607, 200 So. 420; Wallis v. Wallis, 240 Ala. 439, 199 So. 844; Williams v. Williams, 239 Ala. 162, 194 So. 507; Murray v. Murray, 238 Ala. 158, 189 So. 877, 878; Windham v. Windham, 234 Ala. 309, 174 So. 500; Ex parte Allan, 220 Ala. 482, 125 So. 612; Heaton v. Davis, 216 Ala. 197, 112 So. 756.

It is our opinion that the sum of $85 per month for the separate maintenance of the wife in this case better meets the ends of justice. On the record before us, we are of the opinion that the allowance of $100 additional attorneys' fee in this cause is just and right, and fix said fee at that amount.

Let appellant be taxed with the costs of this appeal.

As modified, the judgment is affirmed.

Affirmed, as modified.

GARDNER, C. J., and BROWN and SIMPSON, JJ., concur.

### On Rehearing.

PER CURIAM.

The proper allowance as alimony, separate maintenance, solicitors' fees, etc., to a wronged wife often, if not always, present difficult assignments. Although there are rules, guides and criteria for use in reaching a just and equitable solution of the question, no exact mathematical formula exists for doing so.

On reconsideration of this case, the Court, sitting en banc, has reached the conclusion that the wife is entitled to $100 per month for her separate maintenance, and not $85 per month as adjudged on submission.

As above stated, there is no exact formula for fixing attorneys' fees in matters of this kind. But there is well established authority to the effect that ordinarily fifty percent of the amount allowed for services rendered in the trial court may be allowed for services rendered on appeal. See, Wilson v. Wilson, 198 Miss. 334, 22 So.2d 161, 23 So.2d 303. While not committing this Court to such a formula in all cases, we have upon reconsideration, the Court sitting en banc, concluded that such an allowance may properly be made in this cause.

This case and the ancillary proceeding of Ex parte Taylor (Taylor v. Bailes), Ala. Sup., 37 So.2d 656,[1] involve the same suit for separate maintenance. In respect to attorneys' fees, we considered the cases together on submission, and decided that $400 was a reasonable attorneys' fee in the entire matter: that is to say, fees for the representation of the wife on her petition for maintenance pendente lite; trial of the cause in the court below, and representation on appeal to this Court. Upon reconsideration, however, we have reached the conclusion that the allowance of $200 for representing the wife in presenting her petition for maintenance pendente lite, and $200 for the trial in the court below were not excessive.

The opinion heretofore rendered is modified, as indicated above, and the application for rehearing is overruled.

Opinion modified; application overruled.

BROWN, FOSTER, LIVINGSTON, LAWSON, SIMPSON and STAKELY, JJ., concur.